**Opinion issued March 12, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00844-CV

———————————

### LESLIE R. POGUE AND JEANETTE I. POGUE, Appellants

### V.

### ELIZABETH A. WILLIAMSON, Appellee

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2012-56353

## O P I N I O N

This real-estate contract case asks whether an unambiguous "as-is" and disclaimer-of-reliance provision precludes a buyer's fraudulent-inducement, common-law fraud, statutory-fraud, negligent-misrepresentation, and Deceptive Trade Practice Act (DTPA) claims. The parties to this arm's-length transaction

negotiated its terms, agreed to include clear and broad "as-is" and disclaimer-of-reliance language, and worked with an attorney and a real-estate agent who acted as intermediaries between the two. Because the disclaimer-of-reliance clause is enforceable, it negates the essential element of reliance in the buyer's fraudulent-inducement claim, which in turn renders the "as-is" clause enforceable. The "as-is" clause severs the causal link between the seller's misrepresentation and the buyer's damages. Accordingly, the buyer's claims are contractually barred. We therefore reverse the trial court's judgment and render judgment that the buyer take nothing.

## Background

Appellants Leslie and Jeannette Pogue owned a 33-year-old home in Crosby. The Pogues purchased the four-and-a-half-acre property in 2000. When Hurricane Ike hit Texas in 2008, the property was damaged. The Pogues used insurance proceeds to replace the roof, repaint the house, replace some sheetrock, and repair exterior trim. The following year, the Pogues moved to Bellville and put their Crosby home on the market. After failing to sell their property after seven months, the Pogues retained real estate agent Gina Jones.

The Crosby home was vacant for nearly a year and a half when Lewis Walker, appellee Elizabeth Williamson's then fiancé and eventual husband, expressed interest in the property. Because of his poor credit, Walker could not qualify for a loan. As an alternative, the Pogues agreed to rent the property to him. Before Walker

2

agreed to rent the property, he and Williamson, who lived only two streets away, looked at the property. Williamson was well aware of the property; she described the property as "iconic." Williamson explained, "It wasn't so much just the house. It was just—the land and everything, the way it was set up. It was just a really nice property." Because the Pogues would not sell the property to Walker, Williamson decided to make an offer.

When she made the offer to the Pogues, Williamson visited the property a second time. Like Williamson's first visit to the property with Walker, the Pogues were not there. During this second visit, Williamson noticed that the vacant property's overgrowth was so severe that she could not see the landscaping. She also noticed that the garden was unattended, the garage was full of debris, the pool was black and filled with patio furniture, the inside of the home smelled musty, and the carpet was "nasty" and needed replacing. Williamson described the barn on the property as looking "Silence of the Lambs" scary as it had "needles and syringes on the ground, and on tables." But Williamson, a first-time home buyer, was excited.

Williamson and the Pogues initially entered into an earnest money contract for the sale of the property. The Pogues asked $235,000 for the property, but Williamson, also working with Gina Jones, put together a non-standard offer to purchase the property for $210,000 with a wrap note and a two-year balloon

payment.[1] The Pogues were willing to work with that price and provide owner financing to Williamson. In the earnest money contract, Williamson agreed that she would "accept[] the Property in its current condition." The agreement also provided that Williamson could have the property inspected by professionals, but Williamson decided against an inspection.

Before she could purchase the property, Williamson had to obtain property insurance. During that process, she learned from her insurance company that a wind claim had previously been made on the home. Williamson asked Jones about any insurance claims that may have been made on the property. Jones then contacted Mrs. Pogue, who responded, "We replaced the roof on November 20, 2008, after Hurricane Ike with Holding Roofing Inc., . . . for $18,737.92 . . . . Hope this helps her."

Before the parties closed, Williamson reviewed the seller's disclosure the Pogues prepared. It would later come to light that the disclosure had a number of errors in it. But, at the time, everything looked good to Williamson, and, after signing a number of documents, the parties closed on September 10, 2010. Those documents

---

[1] A wraparound mortgage, or wrap note, is "[a] second mortgage issued when a lender assumes the payments on the borrower's low-interest first mortgage (usu[ally] issued through a different lender) and lends additional funds. Such a mortgage covers both the outstanding balance of the first mortgage and the additional funds loaned." *Wraparound mortgage*, BLACKS LAW DICTIONARY (9th ed. 2009).

included a two-year note, a deed of trust, a warranty deed with a vendor's lien, and a number of other related documents.

The two-year note Williamson signed for the Pogues was for $210,000 and provided for a final balloon payment for the full amount 24 months later. Williamson also signed a deed of trust that secured the Pogues' note and showed a final maturity date of September 25, 2012. The Pogues signed a warranty deed with vendor's lien and conveyed the property to Williamson. Williamson signed the deed as grantee, agreeing to accept the deed and consenting to its form and substance, acknowledging that the terms of the deed "conform[ed] with [her] intent." She further agreed to the obligations imposed on her by the terms of the deed, the accompanying warranty deed with vendor's lien, and the deed of trust.

The deed of trust also included a paragraph that appeared in different typeface and larger font size, making it obvious on the page. It read:

> As a material part of the consideration for the Property, [the Pogues have] executed this deed and granted, sold and conveyed the above described property, premises and improvements, and [Williamson] has accepted this deed and purchased the above-described property, premises improvements, "AS IS." [The Pogues] and [Williamson] agree that there is no warranty by [the Pogues] that the Property is fit for a particular purpose. [Williamson] acknowledges that [she] is not relying upon any representations, statements, assertions or non-assertions by the [Pogues] with respect to the Property condition, but is relying *solely* on [her own] examination of the Property.

(Emphasis in original).

5

Williamson also signed a document acknowledging that Donna Heinlein, the attorney who prepared the closing documents, was instructed by Williamson to refrain from doing 19 specific actions on her behalf, including ordering a title policy, ordering a survey, ordering a title search, "having a termite inspection, and/or having experts inspect the premises and/or appliances," ascertaining whether or not the property was in a 100-year-flood zone, or ascertaining whether there were any drainage problems or drainage easements.

Williamson and Walker moved into the property in October 2010, shortly after they married. Not long after moving in, Williamson began to discover serious problems with the home when she and Walker began replacing the carpet. Over the next two years, the couple discovered extensive wood rot and termite damage; they found mold and water penetration in the bathroom, east bedroom, master bedroom, dining room, bar area, spa room, hallway, garage, kitchen, and piano room— effectively the entire home and much of it behind recently applied paint; they also encountered issues with the septic system leaching through the concrete and other issues, such as the wiring for the electric stove intermittently failing and someone having run a screw through a live wire in the wall. The mold damage was so extensive in some places that it began on the interior walls of the home, extended through the sheetrock and insulation, and stopped at the wood supports just inside the brick exterior. As Williamson and Walker were discovering this damage, they

6

were fixing as much as they could, replacing sheetrock, insulation, carpet, bleaching mold, replacing boards inside and outside, and much more. Williamson and Walker incurred extensive costs during these repairs. By her estimate, between 2010 and 2013, the total cost of her and Walker's labor, subcontracted labor, and supplies was $85,116.92.

Shortly before the final balloon payment became due in September 2012, Williamson sent an email to Mrs. Pogue and asked if she could have an extension on the final payment, but the Pogues refused. Then, for the first time, Williamson told the Pogues about the problems she and Walker had discovered with the home. Williamson then hired an attorney to send a letter to the Pogues complaining that the Pogues did not provide disclosures of the home's condition, the septic tanks were not up to code, there was extensive bug infestation, including termites, and there was mold throughout the home. The letter stated that Williamson could not make the final note payment and requested an 18-month extension. The parties could not reach an agreement, and Williamson filed this lawsuit.[2]

Williamson alleged fraudulent-inducement, common-law-fraud, statutory-fraud, negligent-misrepresentation, and DTPA claims. The basis of her claims against the Pogues was her assertion that the Pogues had failed to disclose to her that

---

[2]  In addition to the Pogues, Williamson sued Jones and Alliance Properties, the real-estate company. Jones and Alliance successfully moved for summary judgment, and the claims against them are not a part of this appeal.

there was wood rot, termite damage, and other water damage in the home. Williamson testified that her complaint was with representations the Pogues made in the seller's disclosure. For example, she noted that the disclosure listed that the home did not have ceiling fans, a cooktop, a dishwasher, and fences, yet the property had all of those things. Additionally, the Pogues stated in the disclosure that they were not aware of any defects or malfunctions with any of the home's electrical fixtures, floors, walls, and ceilings. And during discovery, Williamson obtained a full copy of the insurance claim the Pogues made in 2008 after Hurricane Ike. The insurance claim showed that, in addition to the roof damage, the Pogues claimed water damage and other structural damage throughout the home.

The Pogues filed counterclaims, including for breach of contract, statutory fraud, common-law fraud, negligent misrepresentation, and filing of a fraudulent court record. Litigation progressed over the next seven years, and in April 2017, the case went to a trial. A day into trial, the Pogues dismissed all their counterclaims. That same day, the parties settled their dispute. The case was removed from the trial docket, and the parties were instructed to memorialize their settlement and return it for entry within 45 days. Less than a week later, the Pogues "unilaterally and unequivocally" withdrew consent to the proposed settlement, and the case was returned to the trial docket.

Trial began for the second and final time on May 8, 2017. The trial court adopted and incorporated the pretrial rulings from the previous attempt to try the case. After several days of trial, Williamson rested and moved for a declaratory judgment, asking the trial court to extinguish the deed-of-trust lien granted by Williamson to secure her indebtedness to the Pogues. Williamson argued that, because they abandoned their breach-of-contract counterclaims, the Pogues had no right to enforce their lien. The trial court granted the motion and issued an order permanently extinguishing the Pogues' lien. The jury returned a verdict for Williamson on all claims. Williamson moved to enter judgment. The trial court granted the motion and rendered judgment, awarding Williamson $496,250 in actual damages, $171,972.23 in trial-level attorney's fees, $80,297.44 in pre-judgment interest, and $12,250 in appellate-level attorney's fees, for a total judgment of $760,769.67.

**Analysis**

On appeal, the Pogues raise four issues. They first contend that the trial court erroneously rendered judgment because, as a matter of law, Williamson's signing of the deed of trust, which contained the "as-is" and disclaimer-of-reliance clauses, prevented her from proving an essential element of each of her claims. They next maintain that the trial court's extinguishment of their deed-of-trust lien was a misapplication of Texas law. In the alternative, they argue third that the trial court

9

erroneously calculated the damages. Last, they contend that the trial court's award of attorney's fees to Williamson was improper. Because we conclude that the terms of the deed of trust precluded Williamson from proving the essential elements of causation and reliance, we reach only the Pogues' first and second issues.

## I.      The "as-is" and disclaimer-of-reliance clauses

The Pogues maintain that the deed of trust's "as-is" and disclaimer of reliance clauses bar Williamson's recovery by negating the essential element of causation in her fraudulent-inducement, common-law-fraud, statutory-fraud, negligent-misrepresentation, and DTPA claims.

The jury found in favor of Williamson on all of her claims. Most pertinent to this court's analysis, the jury found that the Pogues made a material misrepresentation regarding the property, the Pogues were aware that their representation was false, the Pogues intended for Williamson to rely on that misrepresentation in entering their agreement, Williamson in fact relied on that misrepresentation, and Williamson suffered damages as a result. These findings, however, do not obviate Williamson's obligation to supply proof of each element for each of her causes of action. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 160 (Tex. 1995). Causation is an element of each of Williamson's theories of liability. *Id.* at 160–61. An enforceable "as is" clause

10

negates causation as a matter of law. *Id.* at 161. Whether an "as-is" clause is enforceable is a question of law we review de novo. *See id.*

In general, a buyer who purchases something "as is" agrees to make her own appraisal of the property and accept the risk that she may be wrong. *Williams v. Dardenne*, 345 S.W.3d 118, 123–24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (citing *Prudential*, 896 S.W.2d at 161). It is in this way that an "as-is" clause acts to sever the causal link between the alleged misrepresentation and damages that is necessary for recovery. *Prudential*, 896 S.W.2d at 161. When a buyer agrees to purchase property "as is," she acknowledges, by her own admission, that she is the sole cause of any damage that may result from unknown defects in the property. *Id.* Williamson agreed when she purchased the property to "accept[] this deed and purchase[] the . . . property, premises improvements, 'AS IS.'" She contends, however, that the "as-is" clause is unenforceable.

A buyer is not bound by an "as-is" clause if she demonstrates that she was induced to enter the agreement by fraudulent representation or concealment of information by the seller. *Id.* at 162. To succeed on this theory, the buyer must show that the defendant made a material misrepresentation; the defendant was either aware that the representation was false or that he lacked knowledge of its truth; the defendant intended for the plaintiff to rely on the misrepresentation; the plaintiff

11

relied on the misrepresentation; and the plaintiff's reliance caused injury. *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019).

The jury found that Williamson proved each element of fraudulent inducement. But the Pogues point out that, under the terms of the deed of trust, Williamson "acknowledge[d] that [she] is not relying upon any representations, statements, assertions or non-assertions by the [Pogues] with respect to the Property condition, but is relying *solely* on [her own] examination of the Property." Clauses like these are known as "disclaimers of reliance."

In a "disclaimer-of-reliance" clause, a buyer generally agrees that she is entering the contract relying solely on her own judgment and not on any statement or representation by the seller. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 178–81 (Tex. 1997). And similar to how demonstrating fraudulent inducement can, as a matter of law, preclude a contract's "as-is" clause, proof of an enforceable disclaimer-of-reliance clause can, as a matter of law, preclude a fraudulent-inducement claim. *Lufkin*, 573 S.W.3d at 229; *Schlumberger*, 959 S.W.2d at 181. The enforceability of this disclaimer-of-reliance provision is a question of law. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (citing *Schlumberger*, 959 S.W.2d at 181). And it is dispositive.

In determining whether a disclaimer-of-reliance clause is enforceable, we consider the totality of the circumstances and whether (1) the disclaimer language is

clear; (2) the terms of the agreement were negotiated, rather than boilerplate; (3) the contract was the product of an arm's-length transaction; (4) the complaining party was represented by counsel; and (5) the parties were knowledgeable in business. *Lufkin*, 573 S.W.3d at 229 (citing *Italian Cowboy*, 341 S.W.3d at 337 n.8, and *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008)).

### *Clarity*

We begin by looking to the contract's language and ask whether the disclaimer-of-reliance language is clear. It is. In unambiguous, plain language, Williamson agreed that she was "not relying upon any representations, statements, assertions or non-assertions by the [Pogues] with respect to the Property condition, but [was] relying *solely* upon [her own] examination of the property." At trial, Williamson maintained that the Pogues misrepresented the property's condition in the seller's disclosure and that she detrimentally relied on that misrepresentation.[3] This clause, however, says the exact opposite. The first factor weighs in favor of enforcing the disclaimer.

### *Negotiation*

---

[3]  Williamson does not argue that the disclaimer-of-reliance clause is limited by its terms to exclude representations regarding the value of the property. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58–59 (Tex. 2008) (rejecting argument, based on plain language of contract, that disclaimer pertained only to certain representations and not others).

We next look to whether the terms of the agreement were negotiated, as opposed to boilerplate. This factor is neither a requirement that every sentence in a contract be negotiated nor a requirement that the parties negotiated the disclaimer-of-reliance clause. *Lufkin*, 573 S.W.3d at 237 n.4. Rather, this factor simply addresses whether the parties negotiated parts of the contract. *See id.* ("Lufkin acknowledges that it negotiated 'certain deal points,' and it does not contend that it could not have negotiated the disclaimers if it had wanted to."). When there is proof that the parties specifically contemplated the issue that has become the topic of dispute, courts should be particularly reluctant to hold a disclaimer-of-reliance clause unenforceable. *See Forest Oil*, 268 S.W.3d at 58.

Although there is no evidence that the parties negotiated the condition of the property, Williamson testified that she did negotiate with the Pogues over price and other terms that she could not remember. Other evidence of negotiations includes the fact that the agreement evolved over the course of their discussions. For example, Williamson requested special terms under which the Pogues would finance $210,000 of the purchase price. Additionally, a number of provisions in the deed of trust appear in different font size and typeface, including the disclaimer-of-reliance clause, which suggests that this was not a boilerplate contract but a contract that was specifically tailored to the parties' desires. This factor weighs in favor of enforcement.

14

### Representation by counsel

The next factor considers whether the plaintiff was represented by counsel. Here, both the Pogues and Williamson were unrepresented. Both agreed, however, to have an attorney draft the documents and have a real-estate broker act as intermediary between the two. Williamson was free to hire her own attorney, but she elected not to hire one. Williamson was told that she could contact the drafting attorney or the real-estate broker with questions concerning the contract, and she did on a number of occasions. Thus, although Williamson was not represented by counsel, neither does the record demonstrate a disparity in representation between the parties. *See Lufkin*, 573 S.W.3d at 229 (observing that parties "were both knowledgeable in business matters and represented by counsel" in analyzing enforceability of disclaimer of reliance). This factor, therefore, is neutral or does not weigh strongly against enforcing the disclaimer.

### Arm's-length transaction

We also consider whether the contract was the product of an arm's-length transaction. The caselaw does not appear to offer a clear definition for "an arm's length transaction." *Black's Law Dictionary*, however, defines "arm's length" as follows: "Of or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involved a confidential relationship." *Arm's-length*, BLACK'S LAW DICTIONARY (9th

15

ed. 2009).[4] And the caselaw suggests that this definition accurately reflects the concern this factor aims to address. *See Schlumberger*, 959 S.W.2d at 175–177 (rejecting plaintiff's argument that contract was not product of arm's-length transaction by examining whether fiduciary, confidential, partnership, or other special relationship existed between parties). No special relationship between the Pogues and Williamson was alleged or existed. Williamson did, however, state that she knew Mr. Pogue because he frequently purchased feed from the store where she had worked. That one contracting party knows the other from customer-employee interactions at a retail establishment cannot be interpreted as evincing a special relationship between the two. *See id.* This sale was an arm's-length transaction, and this factor, therefore, weighs in favor of enforcing the disclaimer.

***Business knowledge***

We consider next whether the parties were knowledgeable in the business matter at hand. This factor is aimed at identifying those transactions in which one party exploits the other's inexperience. *See Bynum v. Prudential Residential Servs., Ltd*, 129 S.W.3d 781, 789 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). Williamson's arguments are framed to suggest that she was working through this

---

[4]     *See also Arm's-length transaction*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("A transaction between two unrelated and unaffiliated parties. A transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises.").

transaction alone, but that is not true. Working with a real-estate agent will show some business knowledge. *Id.* (concluding that plaintiff home buyer was not "so unsophisticated that enforcing the provisions would be unfair" because plaintiff did not work alone but with licensed real-estate broker). Williamson testified that Gina Jones, the listing agent, represented her and the Pogues. Williamson explained that, after "[she] decided to make the offer," she worked with Jones to put together a non-standard offer to purchase the property at a reduced price with a wrap-note and a two-year balloon payment. She also explained that, when she was confused or had questions, she would reach out to either Jones or attorney Heinlein. Throughout the entirety of the negotiations, Williamson was involved, asking questions, seeking information, and working with the real-estate agent. She was a knowledgeable, involved party. *See Dresser-Rand Co. v. Bolick*, No. 14-12-00192-CV, 2013 WL 3770950 at *10 (Tex. App.—Houston [14th Dist.] July 18, 2013, pet. denied) (mem. op.).

Further, while Williamson maintains that she is completely unfamiliar with real-estate transactions as evidenced by the fact that she is a first-time home buyer, the claim is belied by the fact that, shortly before purchasing the Pogues' property, she sold three-and-a-half acres of her own property in Crosby. What is more, Williamson was obviously aware of the "as-is" and "disclaimer-of-reliance" provision because she asked Jones about it, who told her it was "standard

17

contracting." Williamson's acknowledging that she read the provision beforehand is significant because "every person [with legal] capacity . . . is held to know what words were used in the contract, to know their meaning, and to understand their legal effect." *See Amouri v. Southwest Toyota, Inc.*, 20 S.W.3d 165, 169 (Tex. App.—Texarkana 2000, pet. denied); *see also Bynum*, 129 S.W.3d at 789 ("A party who, before entering into a contract, has actual knowledge of terms that he later complains of, is not entitled to escape enforcement of those terms on the ground that the terms are inconspicuous."). Because Williamson was knowledgeable in this transaction, the final factor weighs in favor of enforcement.

### *Totality of the circumstances*

The foregoing factors are not exclusive. *See Forest Oil*, 268 S.W.3d at 60. We must also look at the totality of the circumstances. *Id.* One additional circumstance relevant here is whether the seller interfered with the buyer's attempt to inspect the property. *See Prudential*, 896 S.W.2d at 162. There is no allegation that the Pogues interfered or otherwise impaired Williamsons' ability to inspect the property. In fact, the evidence is just the opposite.

The sales agreement states, "[The Pogues] shall permit [Williamson] and [her] agents access to the Property at reasonable times. [Williamson] may have the Property inspected by inspectors selected by [her] . . . ." Williamson conducted two walkthroughs with her then fiancé and now husband before closing. During these

18

walkthroughs, Williamson noted that the property was in disarray; the garage was full of debris, the yard was overgrown, there were still belongings in the house, the pool was pitch black, the carpet in the home "was really disgusting and gross," and the home had a musty odor. Further, before closing, when Williamson tried to obtain property insurance, her insurance company told her that a wind claim had been made on the property. Williamson then tried to find out more about the claim, and the Pogues and the drafting attorney informed her only that, after Hurricane Ike, the Pogues had replaced the roof. Despite her observations during her walkthroughs and her dissatisfaction with the information the Pogues had provided on the insurance claim, she elected not to have the property professionally inspected. She stated to Heinlein, "[A]fter due diligence, [I am going to] refrain from . . . "[h]aving a termite inspection and/or otherwise having experts inspect the premises and/or appliances." Instead, Williamson signed the sales agreement and checked a box that read, "Buyer accepts the Property in its present condition." These circumstances weigh in favor of enforcing the disclaimer-of-reliance clause.

Additionally, although Williamson was not represented by an attorney, nothing in the circumstances of this transaction prevented her from hiring one or otherwise fully investigating concerns that arose during her inspections of the property. In a letter to both the Pogues and Williamson, the attorney who drafted the contract documents asked both parties to acknowledge that she was making no

19

representations regarding the title and that her sole role was to draft the contract documents. She asked both parties to sign and confirm that they understood this role. Notably, right above Williamson's signature, the letter reads: "[Williamson] understands that [she] ha[s] the right to be represented by an attorney and to have such other attorney present at closing." And right above Williamson's signature in the sales agreement, a clause reads: "CONSULT AN ATTORNEY: Real estate licensees cannot give legal advice. READ THIS CONTRACT CAREFULLY. If you do not understand the effect of this contract consult an attorney BEFORE signing." Despite these notices, Williamson chose not to hire an attorney. This is a relevant circumstance that weighs in favor of enforcing the agreement.

\*　　\*　　\*

After reviewing the totality of the circumstances and determining that the factors identified in *Lufkin Industries* and *Forest Oil* weigh in the Pogues' favor, we conclude that the disclaimer-of-reliance clause is enforceable, meaning Williamson was precluded from proving fraudulent inducement, and therefore the clear and unambiguous "as-is" clause is valid and negates the element of causation necessary to each of her claims. Accordingly, the trial court erred by rendering judgment in favor of Williamson.

## II.　The Pogues' deed of trust

20

The Pogues maintain that the trial court erroneously extinguished the deed-of-trust lien granted by Williamson to secure her indebtedness to the Pogues. Specifically, the relevant order reads:

> [A] Permanent Mandatory Injunction is hereby issued against Defendants Leslie R. Pogue and Jeannette I. Pogue, and their agents, servants, representatives, employees, independent contractors, officers, directors, partners, successors and assigns, who are permanently ENJOINED from and ORDERED to refrain from foreclosing upon the secondary lien filed on 901 Indian Shores Road, Crosby, Texas 77532, contained within the Deed of Trust Security Agreement-Financing Statement, 20100443760, filed in the Harris County Real Property Records on October 15 2010, as that lien has been extinguished or released.

It appears the trial court extinguished the deed because the Pogues abandoned their breach-of-contract counterclaims and, alternatively, because the statute of limitations by which time the Pogues could sue on the deed had expired. Both reasons rest on legal errors.

There are two ways a lien can be foreclosed: judicial foreclosure and non-judicial foreclosure. TEX. CIV. PRAC. & REM. CODE § 16.035(a–b). Judicial foreclosure occurs where one successfully sues for recovery of real property under a real-property lien. *Id.* at (a). Non-judicial foreclosure occurs where one sells real property under a power of sale that was created by a mortgage or deed of trust. *Id.* at (b). A party seeking to foreclose under either method must do so no later than four years after the day the cause of action accrues. *Id.* at (a–b). Also, merely because one method is not available to a party does not necessarily mean the other method is

21

similarly unavailable. *See Holman St. Baptist Church v. Jefferson*, 317 S.W.3d 540, 546–47 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("The statute of limitations provides a personal defense that protects the debtor from an action to collect on the debt after the designated passage of time, but it does not defeat the right of the lender to utilize the collateral already held.") (citing *Goldfrank, Frank & Co. v. Young*, 64 Tex. 432, 436–39 (1885)). The deed of trust expressly allowed the Pogues to enforce their claim "otherwise than through the courts"; that is, through the exercise of a non-judicial power of sale. The trial court's reasoning that the Pogues can no longer foreclose by non-judicial means because they cannot judicially foreclose is erroneous. *See id.*

We now turn to the second reason for the trial court's extinguishment of the Pogues' deed of trust—because the statute of limitations has expired. As mentioned above, regardless of whether a lender proceeds to foreclose on property through judicial or non-judicial means, the lender must do so within four years of the date the cause of action accrued. TEX. CIV. PRAC. & REM. CODE § 16.035(a–b). Whether and when accrual occurs is a question of law. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990). When the claim is breach of contract, the claim accrues when, according to the language of the agreement, facts that authorize the claimant to seek a judicial remedy come into existence. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 591 (Tex. 2017). The Pogues' breach-of-contract claim

accrued on September 25, 2012, when Williamson's balloon payment was due and she refused to pay it. Roughly a year later, on July 22, 2013, the trial court enjoined the Pogues from pursuing their non-judicial remedies, and the trial court made this injunction permanent when it granted Williamson's request to extinguish the deed-of-trust lien.

Where "a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the time during which he is thus prevented should not be counted against him in determining whether limitations have barred his right." *Hughes v. Mahaney & Higgins*, 821 S.W.2d 154, 157 (Tex. 1991) (quoting *Walker v. Hanes*, 570 S.W.2d 534, 540 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.)). When the trial court issued its injunction preventing the Pogues from exercising their non-judicial remedies in July of 2013, the statute of limitations was tolled until such time that the injunction is longer in effect. *See id.* Because there is no legal basis for the trial court's order enjoining the Pogues from exercising their non-judicial remedies, the order was improper.

## Conclusion

We reverse the judgment of the trial court and render judgment that Williamson take nothing. We also vacate the order extinguishing the Pogues' deed-of-trust lien.


Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.